UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

POWER HOME SOLAR LLC,

    Plaintiff,        Case No.  1:21-cv-00910

v.                Hon. Haka Y. Jarbou

ORBIT MARKETING, LLC, D/B/A CLIMAX
SOLAR; AND JOSHUA THOMPSON,

    Defendants.
_____/

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS FOR FAILURE TO JOIN AN INDISPENSABLE PARTY</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

Plaintiff, Power Home Solar LLC (the "Plaintiff" or "PHS"), hereby opposes the Defendants' Motion to Dismiss for Failure to Join an Indispensable Party.  In support thereof, PHS submits this brief.

## STATEMENT OF FACTS[1]

PHS is a solar energy company founded in 2014.  PHS sells, designs, operates, finances, and installs solar panels and energy systems for residential and commercial applications. (R.1, PHS Compl. ¶ 7, PageID.2.)  Since its founding, PHS has invested substantial time and money to market and establish a nationally recognized name and mark in the solar energy field including, but not limited to, sponsoring numerous community and civic organizations and events.  (*Id.* ¶ 8.)   In addition, PHS spends millions of dollars each year on advertising and marketing placements through mediums ranging from internet and social media to television, radio, and billboard advertising.  PHS has maintained partnership, endorsement, and sponsorship deals with several professional sports organizations, such as the Detroit Lions and with Hall of Fame running back Barry Sanders, to name just a few.  (*Id.* ¶ 9.)

PHS expends enormous time and sums of money, many millions of dollars per year, for lead generation to develop its sales.  PHS has an internal team that, along with its marketing partners and external vendors, places ads through many different mediums.  Each time there is return interest from a potential customer (or "prospect"), a form is generated requesting specific identifiers for that customer, whose information is then downloaded to PHS's customer relationship management ("CRM") and predictive dialer databases, to be placed on a lead list. (*Id.* ¶ 11, PageID.3.)  Throughout, the ads go through many different iterations and PHS makes strategic decisions concerning, (i) whether, and when, to refresh these ads and in which

---

[1] In their brief, rather than present the controlling facts relevant to this proceeding, the Defendants have based their entire argument on a set of facts derived from their Complaint pending in state court.

1

advertising mediums to place them; and (ii) how much to spend and in which markets.  These decisions turn on months, if not years, of internal data collection, mining, and analysis.  Once the preliminary lead list is developed, a Solar Development Adviser ("SDA") telephones the prospect to pre-qualify that customer for a solar energy system sale.  (*Id.* ¶ 12.)  PHS's prequalification process involves the SDA asking the prospect a range of questions concerning the prospect's rooftop, utility company and ability to obtain financing through PHS which turns on the prospect's credit score and income.  Once that information is collected, an appointment with the customer is set and a PHS sales representative assigned.   At this juncture, the preliminary lead list has been updated based on the SDA having prequalified the prospect. (*Id.* ¶ 13.)

Upon information and belief, Climax began operating in May 2020.  Climax sells, installs, and finances solar energy products.  (*Id.* ¶ 15, PageID.4.)  In April 2020, Thompson and Climax, through a former PHS employee hired by Climax, wrongly came into possession of PHS's lead lists and other confidential and proprietary information and trade secrets, including such things as its customer and market data, strategic and operating plans, sales strategies, marketing plans, pricing information, and associated financial and budgetary information.  (*Id.* ¶ 16.)  Thompson, with full knowledge of the illegal nature of such conduct and the simple fact that such information and lists did not belong to Climax, then downloaded PHS's confidential business information to his own and/or Climax's private electronic devices for use by Climax. (*Id.* ¶ 17.)

At Thompson's direction and control, Climax used this information to contact PHS's actual and prospective customers to entice them to breach their existing or prospective agreements with PHS.  (*Id.* ¶ 18.)   PHS's lead lists consisted of hundreds of thousands of names.

Being a new company, and having struggled with obtaining its own leads, Climax's employees began calling PHS's leads eight (8) hours per day from which Climax would set, or reset, an appointment or obtain a referral.  For each lead that Climax contacted, PHS had already provided a quote, and some prospects were already on a schedule for installation.  Upon information and belief, to gain that prospect's business, Climax would provide false, disparaging information regarding PHS's pricing and cost structure specifically calculated to usurp PHS's prospect.  (*Id.* ¶ 20, PageID.5.)

Climax relied almost exclusively upon PHS's lead lists to build its company, declining to develop its own due to the inherent time and expense involved.  From the start, internally, Climax even identified its leads as coming from PHS, later scrubbing that reference.  (*Id.* ¶ 21.) Customers thereafter abandoned PHS in favor of Climax owing to statements and representations made by Climax specifically designed to flip the customer.  Thus, rather than spend its own time and money to develop its own leads and business model as PHS did, Climax's actions and conduct were specifically calculated to capitalize on PHS's substantial time investment in order to solicit PHS's actual and prospective customers and thereby gain sales revenue and enhance profits.  Climax even used PHS's "Solar Agreement" as its own, replacing name identifiers only. (*Id.* ¶ 23.)

On April 7, 2021, PHS issued a Cease-and-Desist letter (the "PHS Demand") to Thompson and Climax demanding, *inter alia*, that Climax return PHS's trade secrets and confidential business information.  Climax never responded to the PHS Demand.  (*Id.* ¶ 24.) Instead, almost immediately upon having received the PHS Demand, Climax's inside sales manager instructed Thompson's administrative assistant to put Climax's in-house lead list

containing PHS's leads onto a USB flash drive and to then delete the list from Climax's G Suite. (*Id.* ¶ 25, PageID. 5-6.)

Throughout its briefing, Thompson carefully avoids any acknowledgement that he knew the lead list came from PHS.  In fact, the Defendants state in their brief that they had no "reason to believe the lead list was a protected trade secret or constituted information belonging to [PHS]."  (R.9, Defs' Br. at 4 (citing its Ver. Compl. against Scribner at ¶ 46), PageID.29.) Thompson, however, acknowledges that he (i) received a cease-and-desist letter from PHS; (ii) retained an electronic copy of the lead list; (iii) gave it to his counsel (representing him in this case); but, (iv) *never* responded to the demand letter.  (*Id.* at 4-5, PageID.29-30.)  Thompson's version strains credibility because the easiest thing for Thompson or attorney Keilen to have done *in April 2021* would have been to respond to PHS's counsel and disclose what they believed had taken place.  That never happened because Thompson is not being truthful in his Verified Complaint against Scribner or in his Brief in Support of the Defendant's Motion.

Incredibly, the Defendants submit that "[d]espite Climax Solar and Mr. Thompson's attempt to resolve the matter without litigation, this federal lawsuit was filed by Power Home." (*Id.* at 5, PageID.30.)  In point of fact, not once in the four (4) months following having issued its cease-and-desist letter in April 2021 did PHS receive a single call, email or letter from the Defendants, or their counsel, disputing the Plaintiff's allegations or making any effort, whatsoever, to resolve the matters raised by PHS's Complaint.

## **ARGUMENT**

### I.     **Standard of Review**

Rule 12(b)(7) of the Federal Rules of Civil Procedure allows a party to move for dismissal based on a Plaintiff's failure to join a party under Rule 19.  Assessing whether a party

must be joined under Rule 19 is a three-step process which considers: (1) whether the person or entity is a necessary party under Rule 19(a); (2) if the person or entity is a necessary party, whether joinder would rid the court of subject matter jurisdiction; and (3) if the person or entity must be joined but joinder is not feasible, the court then turns to Rule 19(b) to determine whether the court should "in equity and good conscience" dismiss the case because the absent party is indispensable.  *See Glancy v. Taubman Centers, Inc.*, 373 F.3d 656, 666 (6th Cir. 2004) (internal citations omitted).  Rule 19(b) lists four factors for a court to use in determining whether a party is indispensable.  The court must consider "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided…; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  Fed. R. Civ. P. 19(b).

## II.   Analysis

### a.  *Scribner is Not a Necessary Party.*

The first determination is whether a party is necessary according to Rule 19, and if he is, such party should be joined only if feasible.  *See Keweenaw Bay Indian Community v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993).  Plaintiff maintains that Scribner is not a necessary party to the instant action.  First, in Scribner's absence, complete relief can be accorded to the existing parties, which is a threshold issue the Defendants do not address.  Second, Scribner's interest does not leave the existing Defendants subject to a substantial risk of incurring inconsistent obligations as the Defendants claim.  While Defendants argue that Scribner is a necessary party to avoid having to incur inconsistent rulings in state court, they focus on issues which have no bearing on the instant litigation.

5

That is, the Defendants have cleverly blurred the line between the Plaintiff's allegation of PHS's trade secrets having been stolen, on the one hand, and the Defendants having "used" PHS's trade secrets, on the other. The Defendants' state court case is based, in part, on allegations that Scribner "stole" trade secrets and then committed various deceitful, unrelated acts within the scope of his employment. PHS's federal case squarely involves the Defendants having *used* PHS's trade secrets post-theft. These cases involve two different sets of facts and decidedly different legal claims and theories.

Indeed, the Defendants' Motion is based entirely on the state court set of facts being advanced by Thompson, a Defendant in this federal court case whose conduct is at the center of PHS's allegations and Defendants' wrongdoing. Incredibly, the Defendants do not cite, or even refer, to a single fact or allegation being made by PHS in this federal court case. This case is not about what Scribner did with PHS's lead list once received by Thompson, but what Climax did with PHS's lead list once obtained by Thompson. The Defendants contend that because *they allege* not having had knowledge that PHS's trade secrets were improperly obtained or that the information constituted trade secrets, such is an issue that once determined by the state court, will have an effect on this case. That is because the Defendants believe that Scribner is the sole source of the Plaintiff's evidence as to Thompson's conduct, but he is not. Regardless of what Scribner may have told Thompson regarding the origins of the lead list, that is neither determinative of PHS's set of facts nor controlling as to the claims by PHS in this lawsuit. PHS has direct evidence, from multiple sources - - *not including Scribner*, that Thompson knew exactly where the leads came from. Scribner, therefore, is not a necessary party to PHS's facts despite what Thompson might otherwise believe. As for the Defendants in this case, they can

6

adequately defend themselves since they have discovery devices available to them to involve Scribner should they believe he is essential to their defense.

### b.  *Scribner's Joinder is Not Feasible.*

Even if this Court found Scribner to be a necessary party, Scribner's joinder is not feasible, as his presence in the current litigation would destroy subject matter jurisdiction.  *See* Rule 19(a)(1) (specifically noting that joinder is feasible when the missing party is a person **"whose joinder will not deprive the court of subject-matter jurisdiction."**) (emphasis added). The Defendants labor through an analysis in their brief admitting that to join Scribner in the instant litigation would result in destroying subject matter jurisdiction before this Court. Scribner is a resident of Michigan, and while Plaintiff has brought its Complaint based on substantive proof that the current Defendants have engaged in the violation of federal statutes, the same cannot be said for Scribner.  Plaintiff agrees with the Defendants' conclusion and, therefore, Scribner's joinder would not be feasible.

### c.  *Scribner is Not an Indispensable Party.*

Assuming *arguendo* that this Court determines that Mr. Scribner is a necessary party whose joinder is not feasible, then this Court must examine whether "in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person thus regarded as indispensable."  The Plaintiff maintains that this Court should allow the current litigation to continue as Scribner is not an indispensable party under Rule 19(b) considerations.

### i.  A judgment in the current litigation will not prejudice the existing parties.

Although Defendants argue that continuing with the current litigation would cause them to argue the same issues in two different venues simultaneously, such is not the case.  The

allegations and claims that the Defendants currently have against Scribner in state court have no bearing on the outcome of their culpability in the instant matter, as discussed previously.  Indeed, Defendants have independent claims against Scribner based on a services contract, and for alleged defamation, conversion and for misappropriation of trade secrets—all having nothing to do with PHS.  Although the state court litigation may resolve questions as to whether the Defendants had actual knowledge as to the origin of the lead list, Plaintiff's misappropriation claims can be satisfied by either actual or constructive knowledge.  And again, Scribner is not the sole source of PHS's allegations.

    **ii.  Prejudice against Plaintiff cannot be lessened or avoided with dismissal.**

The Defendants assert that, due to Plaintiff's ability to refile the instant matter after a final judgment from the state court, any potential prejudice to Plaintiff is "certainly" lessened or avoided.  Apart from the Defendants having profited from PHS's lead list, their contention fails to consider the time, energy, and expense that Plaintiff has already put into the instant litigation, and the additional time, energy and expense it would have to incur in refiling the same litigation once the state court litigation reaches resolution—on claims having nothing to do with PHS.  Further, the Defendants' argument fails to consider the prejudice Plaintiff will incur by virtue of waiting for the state court litigation to be complete, something that can only be avoided by continuing with its current federal court claims.

Additionally, it is important to note that the most relevant interest to protect in this inquiry is that of the absentee party, Scribner, who would not be prejudiced should the instant litigation proceed.  Indeed, most courts spend their time focusing on the prejudice that could potentially result to the absentee rather than the prejudice resulting to the parties that are present and able to adequately represent their own interests.  *See Kickapoo Tribe of Indians v. Babbitt*,

43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995) ("The inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to represent its interest.")

### iii. A judgment rendered in Scribner's absence would not be inadequate and Plaintiff will not have an adequate remedy otherwise.

Contrary to Defendants' assertions, a judgment rendered in Scribner's absence would not be inadequate, as the Defendants misrepresent the essential elements related to Plaintiff's claims against them for misappropriation.  And, the Defendants are under the misguided belief that Scribner is the sole source of the Plaintiff's information.  A determination of whether the Defendants had actual knowledge of Scribner's wrongful acquisition of the list does not rid Plaintiff of their claims against them.  While the Plaintiff may pursue the instant claims once the state court litigation is resolved, such an option is not adequate in the face of the current stage of the instant litigation and the time, energy, and expense that has already accrued.

### iv. This Court should proceed with the current litigation.

Defendants argue that should this Court find dismissal inappropriate, then it should exercise abstention from its federal jurisdiction.  As acknowledged by the Defendants, abstention from the exercise of federal jurisdiction is the exception, not the rule.  *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813 (1976).  Indeed, the doctrine of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."  *See id*. The Supreme Court has outlined distinct and narrow factors to consider and while no factor is necessarily determinative, courts are to conduct a careful balancing of the factors as they apply, with preference given to the exercise of jurisdiction.  *See Crawley v. Hamilton County Com'rs*, 744 F.2d 28, 31 (6th Cir. 1984) (citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1 (1983)).  In determining whether

9

to exercise abstention, courts must consider: (1) whether the state court has assumed jurisdiction over any res of property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the source of governing law is state or federal; (6) the adequacy of a state court to protect federal rights; (7) the relative progress of each proceeding; and (8) the presence or absence of concurrent jurisdiction.  *See Romine v. Compuserve Corp.*, 160 F.3d 337, 340-41 (6th Cir. 1998) (citing *Colorado River*, 424 U.S. at 818-19; *see also Moses H. Cone*, 460 U.S. 1).  However, the first step in any *Colorado River* analysis is to first determine whether there is a *parallel* state proceeding before moving on to a consideration of the remaining factors.  *See Romine*, 160 F.3d at 340.

### v.  There is no parallel state proceeding to warrant abstention.

It is important to highlight the vast differences between the ongoing state court litigation with the present federal dispute.  First, it is important to note that the Defendant in the state court has yet to even answer the Complaint or otherwise plead.  Second, the parties and claims in the state court case are completely different.  The current state litigation is not, therefore, a parallel proceeding.  *See Crawley*, 744 F.2d at 31 (finding it unnecessary to undertake remaining analysis when state and federal litigation contained different parties and claims, even where the state court claims could potentially be modified to become identical to the federal claims); *contra Romine v. Compuserve Corp*, 160 F.3d 337, 339-40 (6th Cir. 1998) (finding action parallel where it contained same Defendants, same causes of action, identical theories of recovery, and identical passages in relevant complaints).  Here, the different causes of action, theories of recovery, and defendants make it clear the state litigation is not the type of parallel litigation considered when courts exercise abstention.

vi.  **The relevant factors weigh in favor of the exercise of jurisdiction.**

Even if this Court were to determine that the current state litigation is parallel to the instant federal dispute, consideration of the relevant factors weighs in favor of this Court exercising its federal jurisdiction.  Because some of the factors are not relevant to the instant dispute, Plaintiff will address those that are:

*First*, Defendants argue that the federal forum is less convenient to the parties based on inadequate considerations.  Defendants contend that because a majority of the claims are based on Michigan law and are not entirely federal, the state court is more convenient.  This argument, however, fails to establish why the state forum would be more convenient in light of the existing federal claims which exist in the litigation before this Court.

*Second*, there is no risk of "piecemeal litigation" since the claims against Scribner require vastly different, nondeterminative findings than do the ones that must be made against Thompson and Climax.  Indeed, the claims against Scribner are based on his actions entirely, while the claims before this Court are solely based on the actions of Climax and Thompson, regardless of what the state court might ultimately find against Scriber.  Scribner could never be the actual party liable for Plaintiff's damages as the Defendants suggest, as Plaintiff has independent claims against Thompson and Climax for their own actions after having received PHS's lead list.  The Defendants' default position throughout is that they did not "knowingly" obtain the relevant proprietary information, without explaining how a state court judgment against Scribner would clear them of the allegations that even without actual knowledge, they *should have known* of the origin of the stolen information.

*Third*, as to both the fifth and eight factors, regarding the governing law and potential concurrent jurisdiction, consideration once again weighs in favor of this Court exercising its

federal jurisdiction.   There are two distinct federal claims under the Defend Trade Secrets Act and the Lanham Act, both of which require the application and analysis best suited to come from a federal court.   Further, it cannot be said that both courts have true concurrent jurisdiction, as there remain federal claims over which this Court is the only forum with jurisdiction.

*Lastly*, the sixth factor is not necessarily relevant, as Plaintiff maintains that the state court's outcome is non-dispositive to Plaintiff's federal claims and resolution of such is not necessary to protect Plaintiff's federal rights.

## CONCLUSION

Based on the foregoing, the Plaintiff respectfully requests that this Court deny the Defendants' Motion to Dismiss for Failure to Join an Indispensable Party.

**POWER HOME SOLAR LLC**

By its Attorneys,

Dated:  December 27, 2021

/s/ Conor B. Dugan
Conor B. Dugan
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
conor.dugan@wnj.com

and

Douglas B. Otto*
DARROW EVERETT LLP
One Boston Place
Suite 2600
Boston, Massachusetts  02108
(617) 443-4500
dotto@darroweverett.com

*Admission to the Western District
forthcoming*

12

**CERTIFICATE OF COMPLIANCE REGARDING POWER HOME SOLAR LLC'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO JOIN AN INDISPENSABLE PARTY**

I hereby certify that the Plaintiff Power Home Solar LLC's Brief in Opposition to Defendants' Motion to Dismiss For Failure to Join an Indispensable Party complies with the word count limitations of the Local rules of this Court.  The brief contains 3,574 words of 12-point type.  The word processing software used to prepare this brief was Microsoft Word 2016.

Dated:  December 27, 2021

/s/ Conor B. Dugan
Conor B. Dugan
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
conor.dugan@wnj.com

and

Douglas B. Otto*
DARROW EVERETT LLP
One Boston Place
Suite 2600
Boston, Massachusetts  02108
(617) 443-4500
dotto@darroweverett.com

*Admission to the Western District forthcoming*

13